Tad D. Draper, Bar #4311
LAW OFFICES OF TAD D. DRAPER P.C.
*Legaljustice3@gmail.com*
drapertad@gmail.com
(801) 553-1700
(801) 255-5588 fax

Daniel M. Baczynski, Bar #15530
BACZYNSKI LAW, PLLC
dan@bskilaw.com
(708) 7150-2234
136 West 12300 South, Suite 201
Draper, UT 84020

# IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COLEEN SAYERS, individually and as personal representatives, of the ESTATE OF VILIAMI ALAPATI "WILLIAM" WIGHT,<br><br>    Plaintiff,<br><br>vs.<br><br>UTAH COUNTY, WASATCH BEHAVIORAL HEALTH, NURSE ALLAN MINTER, NURSE SEAN STEPHENSON, HAYDEN ROBERTS CSW, NURSE TORRI ADAMS, NURSE CHAD NELSON, DEPUTY RHETT J LUKE, PA CLARK, STEVONI DOYLE, CSW, DEPUTY ARCHULETTA, SGT. MCFARLAND, SGT. FARISH, and John Does 1 – 10,<br><br>    Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No:<br><br>Judge: |

1

Plaintiff MRS. COLEEN SAYERS is the biological mother of VILIAMI ALAPATI WIGHT.  She brings this action individually, and as the Personal Representative of the Estate of Viliami "William" Wight, by and through her attorneys, and for her Complaint against Defendants alleges as follows:

## **INTRODUCTION**

1. William Wight suffered from schizophrenia. Normally he was a productive member of society able to hold a job. When he suffered a psychotic episode, however, Wight required medical intervention to return to his normal state.

2. On January 7, 2025, Wight suffered a psychotic episode at a car wash. Wight suddenly began rolling on the ground of the car wash office while striking himself with a chair. He continued to strike his head while in the police cruiser on the way to American Fork Hospital. At the American Fork Hospital, Wight was hitting his head on the floor, ripping out his IV, and attempting to eat needles.

3. Officers booked William Wight into the Utah County Jail on January 7, 2025. For more than a week, Wight continued to exhibit increasingly extreme behavior, including continued self-harm by hitting his head on the concrete cell wall and floor, eating feces, naked dancing, and smearing feces on the cell wall/window.

4. Coleen Sayers, Wight's mother, called the Utah County Jail every day of Wight's incarceration to inform the Jail's medical staff that Wight was schizophrenic, that he was off his medication, and that he needed his medication or he would continue to suffer from

2

his psychotic episode. The calls were unheeded, and Wight did not receive medication or any mental health intervention.

5. Wight was put on 15-minute watch due to his obvious mental illness. Consequently, jail personnel meticulously observed Wight suffer needlessly as his mental and physical state deteriorated, as Wight continued to smash his head on concrete and become severely dehydrated. The Jail knowingly and deliberately acted indifferently to his obvious and worsening mental and physical condition.

6. Finally on January 14, Wight reached an irreversible crisis and had a seizure. This prompted the Jail to finally act and the jail called an ambulance for emergency medical attention. Following the seizure, and shortly before transporting him by ambulance to Utah Valley Hospital, the Jail attempted to provide long-deprived medication and an I.V. of critical fluids. It was far too late.

7. Due to repeatedly bludgeoning his head and the severe dehydration, Wight had developed blood clots in his brain. Shortly upon arriving at the Utah Valley Hospital, Wight underwent unsuccessful brain surgery and was officially pronounced dead on January 21, 2025.

8. The death of William Wight was the direct result of the knowing, indifferent and deliberate indifference of the Jail and its personnel. The Jail and its personnel failed to provide him with an effective evaluation, essential medical and psychiatric care, proper hydration, and critically essential medication. The Jail and its personnel permitted Wight to suffer severe dehydration, pain, severe mental anguish, and extreme and unnecessary

3

suffering. The jail took Wight's life in the most egregious, deliberate and indifferent way that can be imagined. The jail violated Wights Federal and State constitutional and civil rights.

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' cause of action arising under the Constitution of the United States and 42 U.S.C. § 1983 and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over Plaintiffs' causes of action arising under the Utah state law pursuant to 28 U.S.C. § 1367, and the Utah State Constitution.

10. Venue lies in the United States District Court for the District of Utah because the events and omissions giving rise to Plaintiffs' claims occurred in Utah. 28 U.S.C. § 1391(b)(2).

11. Defendants are subject to personal jurisdiction within this district.

## PARTIES

12. Prior to his death, William Wight was, and at all times pertinent has been, a citizen of the United States.

13. Mrs. Sayer, mother of the deceased, is allowed to bring her own actions for violation of his First Amendment rights, and actions on behalf of the Estate of William Wight for his death and suffering as the personal representative without opening formal probate. Utah Code Ann. § 78B-3-106.5.

14. Defendant is Utah County (County), which is a political subdivision of the State of Utah. As part of its corporate powers, and at all times relevant, the County maintained the Utah

4

County Jail.  All references in this Complaint to "Jail" refers to Utah County, and its jail, the Utah County Jail.

15. Defendant is Logan Clark, a Physician Assistant employed by Utah County to work at the Jail.

16. Defendant is Nurse Allan Minter, a Nurse employed by Utah County to work at the Jail.

17. Defendant is Nurse Sean Stephenson, a Nurse employed by Utah County to work at the Jail.

18. Defendant is Nurse Torri Adams, a Nurse employed by Utah County to work at the Jail.

19. Defendant is Nurse Chad Nelson, a Nurse employed by Utah County to work at the Jail.

20. Defendant is Deputy Rhett J Luke, a Nurse employed by Utah County to work at the Jail.

21. Defendant Wasatch Behavioral Health is a Special Service District of Utah County which provides, amongst other services, assessments and therapy to Utah County Jail inmates.

22. Defendant is Hayden Roberts, CSW, a social worker contracted by Utah County through employer Wasatch Behavioral Health to provide medical/mental health services at the Jail.

23. Defendant is Stevoni Doyle, CSW, a social worker contracted by Utah County through employer Wasatch Behavioral Health to provide medical/mental health services at the Jail.

24. Defendant is Deputy Archuletta, an Officer employed by Utah County to work at the Jail.

25. Defendant is Sgt. McFarland, an Officer employed by Utah County to work at the Jail.

26. Defendant is Sgt. Farish, an Officer employed by Utah County to work at the Jail.

27. John Does 1 – 10 are individuals or entities that were employed by Utah County to provide medical care at the Utah County Jail during all times relevant. These individuals and/or entities were acting within the scope of their employment when they failed to address William Wight's untreated psychotic condition and his dehydration. All of these individuals worked with William Wight during his stay at the Utah County Jail and participated in the denial or delay of medical care.

28. Defendants are persons under the meaning of 42 U.S.C. § 1983 and are located in this judicial district.

29. Utah County has a non-delegable duty to provide adequate medical care at the Jail. Utah County cannot avoid liability for constitutional violations simply because it has outsourced some of its medical care to outside parties.

## GENERAL ALLEGATIONS

30. Wight was born on August 10, 1993. He was 31 years old when he died in the Utah County Jail/Utah Valley Hospital.

31. Wight had been previously diagnosed with psychosis, schizophrenia, and manic episodes.

32. During prior manic episodes, Wight was treated successfully with the antipsychotic medication Zyprexa (olanzapine). Wight was to take this medication when he began showing signs of a manic episode.

33. On January 7, 2025, Wight suffered a manic episode at a car wash in Lehi, Utah. Wight was rolling on the floor and hitting his head with a chair.

34.  Lehi Police were called and arrested Wight for public disturbance and resisting arrest.

35. Wight was acting "erratic". Officers observed Wight chewing on a large metal object and trying to swallow it. Wight was further convinced that the officers were trying to kill him.

36. Lehi officers immediately recognized Wight was having a manic episode.

37. Colleen Sayers, Wight's mother, approached the officers at the car wash and informed them Wight had schizophrenia and needed to go to the hospital for treatment because he was not taking his prescribed medication.

38. Lehi officers then took Wight to American Fork Hospital to be screened for drugs. Wight continued to hit his head in the back of the police car.

39. While at the hospital, Wight pulled out his IV and tried to eat a catheter, a needle, and various other debris on the ground.

40. The American Fork Hospital cleared Wight, and the officers booked Wight into the Utah County Jail.

<u>Wight's Mother Calls the Utah County Jail about Needed Medication</u>

41. Wight was incarcerated at the Jail from January 7, 2025, through January 14, 2025.

42. Colleen Sayers, Wight's mother was notified of his arrest and went immediately to the Utah County Jail.

43. In the Jail lobby, Utah County has a sign that advised interested or concerned persons to notify Jail personnel if an inmate suffers from a mental disorder or condition that required the administration of medication.

7

44. While at the Jail, Sayers notified the Jail and its medical staff that Wight suffered from schizophrenia, and he needed olanzapine (Zyprexa) to regulate his mental state and condition.

45. Sayers explained that he was obviously off his medication, and that his mental condition would stabilize and return to normal almost immediately if he were administered his medication.

46. Thereafter, on each and every day of Wight's incarceration, Colleen called the Jail and spoke directly with medical personnel to advise of Wight's urgent need to receive his mental health medication.

47. In each instance, Colleen made it clear that Wight needed his mental health addressed and needed his medication to restore and maintain his mental health

48. Jail staff told Sayers they would administer medication to Wight.

49. During the entire time of Wight's incarceration, he did not receive a mental health assessment.

50. Other than right before Wight was transferred to the hospital, Wight was not given his mental health medication or any alternate mental health medication.

51. Due to Wight's impaired and dangerous mental state, during his entire incarceration, he suffered and engaged daily in obviously erratic behavior, including repeatedly smashing his head into walls and fixed objects, eating and playing with feces, and dancing.

8

## JANUARY 7

### Nurse Allan

52. On January 7, 2025, Nurse Allan was responsible for administering an intake screening.

53. Intake screenings are "performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met". National Commission on Correctional Health Care, *Standard for Health Services in Jails*, (NCCHC Standard) Polic J-E-02.

54. As the intake screener, Nurse Allan was to "refer immediately for care and medical clearance" for all persons who are "mentally unstable".

55. Lehi officers told Nurse Allan about their experience with Wight, including his erratic behavior, banging his head against a chair, and attempting to swallow his IV needle.

56. Lehi officers also told Nurse Allan that Wight had been cleared of drugs by American Fork Hospital and provided Nurse Allan with Wight's discharge papers.

57. The American Fork Hospital discharge papers indicated that Wight was on Zyprexa 15 mg daily and that Wight had been previously diagnosed with psychosis and schizophrenia.

58. American Fork Hospital had also ordered two medications for Wight: Ziprasidone (an antipsychotic) and Lorazepam (a benzodiazepine). As noted in the discharge papers, these medications were not administered to Wight's prior to discharge from the Hospital.

59. Nurse Allan reviewed the discharge papers.

9

60. Lehi officers also told Nurse Allan that Wight was previously diagnosed with schizophrenia.

61. "Schizophrenia is a serious mental health condition that affects how people think, feel and behave. It may result in a mix of hallucinations, delusions, and disorganized thinking and behavior."[1]

62. The Utah County Jail does not have the resources to care for a schizophrenic inmate suffering through a manic episode.

63. Utah County Jail policies state that inmates with a diagnosed mental disability should not be accepted at the Jail.

64. Nurse Allan did not perform the intake screening.

65. Despite exhibiting clear and obvious signs of being "mentally unstable", Nurse Allan did not immediately refer Wight for care.

66. Despite Utah County policy denying admission to individuals with diagnosed mental disabilities, Nurse Allan admitted Wight into the jail and left him in a prebook cell.

67. Wight was stripped of his clothes and covered with a smock.

68. Wight continued to self-harm unabated.

## <u>JANUARY 8</u>

<u>Nurse Allan</u>

69. The next day, January 8, Nurse Allan attempted to perform the intake screening.

70. Wight was lying nude on the concrete floor.

---

[1] https://www.mayoclinic.org/diseases-conditions/schizophrenia/symptoms-causes/syc-20354443

71. When Nurse Allan began asking Wight questions, he began "to sign and point at [Nurse Allan] and make different hand signals that [she] could not make out".

72. Nurse Allan recognized that Wight was suffering from a mental health illness.

73. Nurse Allan did not complete the intake screening.

74. Nurse Allan, again, failed to refer Wight for immediate care or medical clearance.

75. Instead, Nurse Allan left Wight in his concrete room to continue to self-harm.

<u>Nurse Sean Stephenson</u>

76. After Nurse Allan's failed attempt, Nurse Stephenson tried to complete an intake exam of Wight later that night (January 8).

77. Nurse Stephenson noted Wight was exhibiting signs of a mental health issue. Stephenson noted that Wight had been diagnosed or exhibited signs of schizophrenia and was also acting in a strange manner. Stephenson recorded that Wight was uncooperative, tearful, and exhibited signs of "bizarre behavior".

78. Nurse Stephenson also reported Wight "may be a danger to himself", noting that Wight had tried eating his IV and had hit his head on the ground.

79. Nurse Stephenson knew that Wight was diagnosed with schizophrenia, knew that the Jail lacked the resources to house a schizophrenic inmate suffering a manic episode, and knew that policy required Wight's refusal from the Jail.

80. Nurse Stephenson admitted Wight to the Jail.

81. Nurse Stephenson, however, did not refer Wight for medical care or medical clearance.

82. Nurse Stephenson did not order any other precautions to stop Wight from self-harming.

83. Wight was then placed in administrative segregation (isolation) due to his behavior. The isolation cell is made of concrete and has no safety features designed to accommodate mentally ill patients.

84. Nurse Stephenson ordered that Wight be put on "non-acute suicide watch" with 15-minute checks.

85. Inmates that are nonacute suicidal are supposed to be monitored by facility staff at unpredictable intervals with no more than 15 minutes between checks. NCCHC Polic J-B-05.

86. Each 15-minute check is to be documented to ensure compliance.

87. According to NCCHC standards, nonacute suicidal inmates are not to be kept in isolation. If said inmates are kept in isolation, they require "continuous" "direct staff monitoring".

88. There is no documentation that Utah County staff performed the 15-minute checks.

89. There is no documentation that Utah County staff performed continuous direct monitoring on Wight while he was housed in isolation.

90. On January 8, 4:31 pm, Deputy Valle received a call from Sayers stating Wight was schizophrenic and needed his medication. Deputy Valle recorded this information in Wight's medical record.

<u>Hayden Roberts, CSW</u>

91. Utah County contracts with Wasatch Behavioral for social workers to provide some mental health services at the Jail.

92. On January 8, 2025, Social Worker Roberts approached Wight to perform a mental health evaluation.

93. A mental health evaluation "is performed to ensure that urgent mental health needs are met". NCCHC Policy J-E-05.

94. Under NCCHC standards, "inmates who screen positive for mental health problems are referred to qualified mental health professionals for further evaluation". *Id*.

95. "Patients who require acute mental health services beyond those available on-site" must be transferred to an appropriate facility. *Id*.

96. Roberts either reviewed Wight's medical records or at minimum should have reviewed his medical history prior to attempting a mental health evaluation.

97. Roberts observed Wight was "naked and dancing". Deputies told Roberts this was "common behavior" for Wight. Wight refused to speak. His cell had feces smeared on the window.

98. Roberts knew that Wight was self-harming.

99. Though Wight demonstrated clear signs of mental instability, Roberts did not do anything to help Wight.

100. Roberts did not refer Wight for treatment or medical clearance.

101. Despite it being obvious that Wight needed a higher level of care, Roberts did not request Wight's transfer out of the jail

102. Instead, Roberts simply cancelled the mental health evaluation and requested that another social worker assess Wight.

103. By delaying medical intervention, Roberts allowed Wight to continue to self-harm.

## JANUARY 8 -10

104. There are no records for the dates of January 8-10. It appears Wight was not seen by medical staff for these dates. There is also no documentation that staff performed the 15-minute checks ordered by Nurse Stephenson.

105. On information and belief, Wight's condition worsened over these three days. Wight continued to self-harm and was not eating or drinking.

106. Jail staff observed Wight's behavior but apparently none of the guards requested a medical intervention or assessment.

## JANUARY 11

### Nurse Torri Adams

107. On January 11, 2025, Nurse Adams visited Wight's cell for med pass.

108. Nurse Adams observed Wight "jumping around naked in his cell", "pretending to wrap his feet with something".

109. Nurse Adams knew that Wight had been self-harming since his admission to the Jail.

110. Nurse Adamas observed clear signs of mental instability.

111. Adams did not refer Wight for treatment or medical clearance.

112. Adams did not do anything to prevent Wright from self-harming.

### **JANUARY 12**

113. There are no records for this date. It appears Wight was not seen by medical staff. There is also no documentation that staff performed the 15-minute checks ordered by Nurse Stephenson.

114. On information and belief, Wight's condition continued to worsen. Wight self-harmed and was not eating or drinking.

115. Jail staff observed Wight's behavior but none of the guards requested a medical intervention or assessment.

### **JANUARY 13**

Stevoni Doyle, CSW

116. Doyle visited Wight to perform a mental health evaluation on January 13, 2025.

117. Doyle either reviewed Wight's medical records or at minimum should have reviewed his medical history prior to attempting a mental health evaluation.

118. Doyle observed that Wight was "disoriented, disheveled, unkept, [and] naked". Wight "just sat there staring and putting stuff up his nose". Wight was nonresponsive to Doyle's questions. Feces remained smeared across Wight's room.

119. Doyle knew that Wight was self-harming.

120. Though Wight demonstrated clear signs of mental instability, Doyle did not do anything to help Wight.

121. Doyle did not refer Wight for treatment or medical clearance.

122. Despite it being obvious that Wight needed a higher level of care, Doyle did not request Wight's transfer out of the jail

123. Instead, Doyle simply cancelled the mental health evaluation and requested that another social worker assess Wight.

124. By delaying medical intervention, Doyle allowed Wight to continue to self-harm.

<u>Nurse Chad Nelson</u>

125. On January 13, Sayers called Nurse Nelson to ask about her son.

126. Wight was supposed to appear for a hearing that day, but the Utah County Jail did not transfer him or otherwise facilitate his appearance.

127. Sayers told Nurse Nelson that Wight has schizophrenia and that she was concerned about Wight not being on medication.

128. Sayers further told Nurse Nelson that Wight's medication was previously filled at Mountainlands Pharmacy.

129. Nurse Nelson told Sayers he would make sure the medications were verified "tomorrow".

130. Nurse Nelson knew that Jail policy required that inmates with schizophrenia should not be at the Jail because the Jail lacked the medical resources to care for said inmates.

131. Nurse Nelson, however, made no attempts to have Wight seen by a physician or to implement any medical treatment.

132. Nurse Nelson, like all medical staff at the Utah County Jail by this time, knew that Wight was eating feces, smearing feces across his room, dancing naked, and self-harming.

133. Nurse Nelson took no steps to mitigate or stop Wight from self-harming.

16

## JANUARY 14

### Deputy Rhett J Luke

134. On January 14, 2025, at 9:51 am, Deputy Luke noted that Wight "had an extremely dirty cell with food all over it" and that Wight is "showing signs of mental illness as he has been unwilling to talk and often will make odd noises".

135. Wight appeared to be "in lots of pain".

136. Deputy Luke knew, through observation and conversation with other guards, that Wight had been self-harming.

137. Despite clear signs of mental instability, Deputy Luke failed to call medical to intervene or otherwise assess Wight.

138. Deputy Luke took no steps to stop Wight from self-harming.

### PA Clark

139. At 11:54, Wight was found on the ground of his cell floor face down. His body was twitching, and it looked like he was having a seizure. Wight would not talk but "would only look at us".

140. Wight was taken medical to be seen by PA Clark.

141. PA Clark, as the sole "physician" at the Utah County Jail, learned of Wight's stay within a few days of his admission to the Jail.

142. PA Clark, at minimum, knew that Wight was being housed in isolation due to self-harm and erratic behavior.

143. PA Clark, at minimum, knew that Wight was diagnosed with schizophrenia.

17

144. PA Clark knew that the jail lacked the medical resources to care for a schizophrenic inmate suffering from a manic episode.

145. Not only did PA Clark not immediately transfer Wight to a higher level of care, but he also never assessed Wight prior to January 14.

146. PA Clark also failed to order any medical intervention or precautions for Wight prior to January 14.

147. PA Clark first saw Wight in the jail medical unit after he suffered a seizure.

148. Wight was severely dehydrated, exhibiting high blood sugar and low blood pressure.

149. Wight also had "something similar to paint chips in his mouth".

150. Shortly before being transferred to Utah Valley Hospital, and after Sayers had been calling every day to ask that her son be put on medication, PA Clark *finally* ordered 2 mg of risperidone, an antipsychotic for treating schizophrenia. In Wight's highly deteriorated state of decline, however, he spat out the medication.

151. PA Clark also ordered two bags of fluids.

152. After Wight was taken to medical, Nurse McAllister called Mountainlands Pharmacy to check on prior prescriptions for Wight. Mountainlands reported they had no current or recent prescriptions.

153. Sayers then called the Jail to ask about medications for her son. The Jail reported they could not confirm a prescription with Mountainlands. Sayers said that the Mountainlands in Provo had the prescription and that she would bring the prescription directly to the Jail.

154. Sayers called Wight's doctor, who signed a new prescription for Wight.

18

155. At 2:59 pm, PA Clark decided to transfer Wight to the Utah Valley Hospital by ambulance because blood tests showed he was suffering from moderate to severe kidney damage and significant dehydration.

156. Wight's blood tests from American Fork Hospital one week prior showed normal kidney function.

157. This is not the first time that an inmate suffered severe dehydration while under Clark's medical supervision. In 2016, while Clark was contracted as the PA for the Duchesne County Jail, inmate Madison Jensen died of severe dehydration during her incarceration.

<u>Utah Valley Hospital</u>

158. The Utah Valley Hospital performed a CT scan as part of its evaluation on Wight and discovered dural venous sinus thrombosis (DVST) - a condition where a blood clot forms in one or more of the large veins that run through the dura mater, the tough outer layer of the brain.

159. The Hospital also noted "extensive" bruising across Wight's face and body, as well as "significant acute kidney injury" caused by severe dehydration.

160. These blood clots were caused by blunt force trauma to the head (self-harm). The clotting was further exacerbated by extreme dehydration. Both the self-harm and the dehydration had gone on for the entire week of Wight's incarceration, for which Utah County Jail had done nothing to stop or abate.

161. Due to the severity of the clotting, doctors performed surgery to remove the blood clots in Wight's dangerously swollen brain.

## **JANUARY 15**

162. The next morning, Wight was unresponsive to verbal commands and would only occasionally open his eyes.

163. At 7:35 AM, doctors visited with Deputy Archuletta who was stationed in Wight's room.

164. Doctors told Archuletta that the results were not good and Wight's family needed to be notified so they could say their goodbyes.

165. The Hospital contacted the family at 11:19 AM after Utah County approved a visit from the family.

166. At 12:50 PM, Wight's family arrived at the Hospital.

167. Upon seeing her son, Sayers was distraught.

168. Sayers took a video of her son's face and said she was going to put it on TikTok so people would know how Utah County treated its mentally ill inmates.

169. Deputy Archuletta contacted supervisors Sgt. McFarland and Sgt. Farish.

170. Worried that information about Wight would be made public, they came up with the plan to threaten Wight's family with expulsion if Sayers did not delete the video and agree not to post it on TikTok.

171. Sayers refused, so Deputy Archuletta forced Wight's family out of the hospital.

172. Wight's family had to leave their son's bedside near the end of this life.

173. Wight's family went to post bail, so Utah County would no longer have custody over their son.

174. Several hours later, at 6:57 PM, Wight's family posted bail and were allowed to return to their son's room.

175. That evening, the Hospital performed brain surgery on Wight due to edema in his head.

## JANUARY 16 -21

176. The next morning, January 16, Wight exhibited no signs of brain activity.

177. Wight was declared brain dead at 5:15 pm on January 16.

178. Wight's family kept Wight on life support for a few days so that the family from out of town could come and say goodbye.

179. Wight was pronounced dead on January 21 after life support was removed.

180. Wight's death was caused by Utah Court's failures and inactions, including the withholding of necessary medical and psychiatric care, the withholding of critical medication, failure to address obvious dehydration, and the failure to prevent ongoing self-inflicted trauma to Wight's brain.

## CAUSE OF ACTION I – DELIBERATE INDIFFERENCE

**Violation of Wight's 8th and/or 14th Amendment Rights–Failure to Provide Proper Medical Care (Cognizable under 42 U.S.C. §1983)**
*Against Individual Defendants NURSE ALLAN MINTER, NURSE SEAN STEPHENSON, HAYDEN ROBERTS CSW, NURSE TORRI ADAMS, NURSE CHAD NELSON, DEPUTY RHETT J LUKE, PA CLARK, STEVONI DOYLE, CSW*

181. Plaintiffs incorporate by reference all preceding paragraphs.

182. Defendants were acting in a government function by providing medical care at the jail.

183. Defendants had a constitutional duty to provide timely medical treatment for serious medical conditions. Defendants knew or should have known about Wight's obvious

21

medical needs, and with deliberate indifference to such medical needs, Defendants acted or failed to act in such a way to deprive Wight of necessary and adequate medical care, thus endangering his health and well-being. Such acts and/or omissions of Defendants violated rights secured to Wight under the 8th and/or 14th Amendment of the United States Constitution.

184. Defendants allowed Wight, an inmate suffering from a serious mental health condition who was undergoing a manic episode, to reside in the Jail for one week even though the facility clearly lacked the medical resources to address Wight's mental illness.

185. Despite regular and ongoing self-harm, including hitting his head and body against the concrete floor and walls, becoming severely dehydrated, and ingesting feces, Defendants failed to implement any care or treatment.

186. Despite regular and ongoing self-harm, including hitting his head and body against the concrete floor and walls, and ingesting feces, Defendants failed to perform a basic mental health evaluation.

187. Instead, Defendants simply ignored Wight because he was difficult to handle, and his behavior was gross.

188. Defendants breached their duties and were deliberately indifferent to Wight's medical needs and serious medical condition by failing to provide any medical attention to Wight despite his obvious and ongoing psychotic condition, and his ever-increasing dehydration.

189. As a direct and proximate result of Defendants' deliberate indifference, Wight suffered severe dehydration and extensive blood clots in his brain. These conditions ultimately caused Wight's death.

190. On information and belief, Wight was caused to endure prolonged pain and suffering leading up to the time of his death, even though his condition could have been diagnosed, treated, and stabilized. Accordingly, Plaintiffs seek compensation in an amount to be determined at trial for the pain and suffering. Wight endured prior to his death, and for the wrongful death of Wight.

191. Further, due to the egregious nature of Defendants' indifference and reckless distraught for the health, safety, and the very life of Wight, Plaintiff seeks punitive damages against said Defendants.

## CAUSE OF ACTION II
### Violation of the 8th and 14th Amendments - Failure to Train/ Unconstitutional Practices
### (Cognizable under 42 U.S.C. §1983)
*Against Utah County*

192. Plaintiffs incorporate by reference all preceding paragraphs.

193. Utah County is considered "persons" under 42 U.S.C. §1983 and thus may be liable for causing a constitutional deprivation.

194. County may be held liable for constitutional wrongs caused by its failure to adequately train or supervise subordinates due to deliberate indifference.

195. County may be held liable for constitutional wrongs caused by deficient policies or practices.

196. On information and belief, Utah County regularly delays or denies access to mental health treatment and medications, causing inmates to suffer needlessly.

197. Utah County has a policy or practice whereby it regularly denies patients access to mental health medications which have been prescribed by a physician.

198. Utah County makes these decisions to discontinue prescribed medications without input or review by a prescriber or mental health practitioner.

199. In some cases, Utah County staff will re-prescribe the medications if an inmate continues to struggle with their mental health over a prolonged period.

200. Utah County's practice, however, regularly results in the unnecessary delay in medication to inmates who need their psychotropic medication. This delay causes inmates to needlessly suffer from their mental health conditions.

201. Moreover, Utah County does not have protocols in place which tell nurses how to handle a mental health crisis.

202. Nor does Utah County provide training to nurses on how to handle a mental health crises.

203. As a result, inmates suffering from mental health disorders needlessly languish in cells which are not outfitted to safely hold said patients.

204. The Utah County Jail does not have the medical resources to handle individuals suffering from serious mental health disorders, yet nursing staff regularly admit these individuals despite jail policy not to admit these individuals.

205. If Utah County provided basic training or protocols on mental health, nursing staff would have known: (1) not to admit Wight due to his schizophrenia; (2) if admitted, to

24

immediately refer a schizophrenic patient for a mental health evaluation;(3) administer

the appropriate medication as per the written order from the American Fork Hospital and

as demanded by Wight's mother daily, and,  and (4) if an inmate is self-harming, to either

implement precautions to make the inmate safe or to transport the inmate to a high level

of care (such as an inpatient treatment facility).

206. Instead, due to the lack of training and policies, staff have learned to ignore inmates even

when exhibiting severe and bizarre behaviors.

207. Defendants foresaw, or should have foreseen, the possibility of inmates receiving

inadequate or delayed mental and physical health care and developing severe dehydration

while in the custody of Utah County Jail.

208. As a direct and proximate result of Defendant's actions, inactions, and/or deliberate

indifference, Wight was deprived of his rights by Jail employees and agents in violation

of the 8th/ 14th Amendment to the United States Constitution and 42 U.S.C. §1983, i.e., he

was deprived of his life without due process of law.

<u>**CAUSE OF ACTION III**</u>
**Violation of the 8th and 14th Amendments - Failure to Train/ Unconstitutional Practices**
**(Cognizable under 42 U.S.C. §1983)**
*Against Wasatch Behavioral Health*

209. Plaintiffs incorporate by reference all preceding paragraphs.

210. Wasatch Behavioral Health (WBH) is considered "persons" under 42 U.S.C. §1983 and

thus may be liable for causing a constitutional deprivation.

211. WBH may be held liable for constitutional wrongs caused by its failure to adequately

train or supervise subordinates due to deliberate indifference.

212. WBH may also be held liable for constitutional wrongs caused by deficient policies or practices.

213. WBH fails to train its social workers on how to handle mental health evaluations and treatment at the Utah County Jail.

214. Upon information and belief, WBH provides no specific training to its social workers regarding jail operations or policies regarding mental health and mental health evaluations.

215. The Jail is different from other outpatient environments because an inmate, or an inmate's family or other concerned persons, do not have the ability to have the inmate receive an independent evaluation.

216. WBH also has a practice/policy where if an inmate is too mentally impaired, social workers will simply discontinue the mental health evaluation.

217. WBH knows that Utah County Jail does not have mental health professionals and therefore relies on WBH to accurately evaluate inmates.

218. WBH's lack of training, coupled with its practice of discontinuing mental health evaluations in the face of severe mental illness, puts inmates at risk for serious harm.

219. WBH foresaw, or should have foreseen, the likelihood that inmates who receive inadequate mental health evaluations will not receive the care necessary at the Utah County Jail, leading to serious harm and/or death.

220. As a direct and proximate result of Defendant's actions, inactions, and/or deliberate indifference, Wight was deprived of his rights by WBH employees in violation of the 8th/

14th Amendment to the United States Constitution and 42 U.S.C. §1983, i.e., he was

deprived of his life without due process of law.

### CAUSE OF ACTION IV – Unnecessary Rigor[2]
**Violation of Article I, Section 9 of the Utah Constitution**
*Against Defendants NURSE ALLAN MINTER, NURSE SEAN STEPHENSON, HAYDEN
ROBERTS CSW, NURSE TORRI ADAMS, NURSE CHAD NELSON, DEPUTY RHETT J LUKE,
PA CLARK, STEVONI DOYLE, CSW*

221. Plaintiffs incorporate by reference all preceding paragraphs.

222. Defendants were acting in a government function by providing medical care at the jail.

223. Defendants had a constitutional duty to provide timely medical treatment for serious
medical conditions. Defendants knew or should have known about Wight's obvious
medical needs, and with deliberate indifference to such medical needs, Defendants acted
or failed to act in such a way to deprive Wight of necessary and adequate medical care,
thus endangering his health and well-being. Such acts and/or omissions of Defendants
violated rights secured to Wight under the 8th and/or 14th Amendment of the United
States Constitution.

224. Defendants allowed Wight, an inmate suffering from a serious mental health condition
who was undergoing a manic episode, to reside in the Jail for one week even though the
facility clearly lacked the medical resources to address Wight's mental illness.

225. Despite regular and ongoing self-harm, including hitting his head and body against the
concrete floor and walls, and ingesting feces, Defendants failed to implement any care or
treatment.

---

[2] Although not required, Plaintiffs did comply with the Notice of Claim requirements under Utah Code § 63G-7-401.

226. Despite regular and ongoing self-harm, including hitting his head and body against the concrete floor and walls, and ingesting feces, Defendants failed to perform a basic mental health evaluation.

227. Instead, Defendants simply ignored Wight because he was difficult to handle, and his behavior was gross.

228. Defendants breached their duties and subjected Wight to deliberate indifference by ignoring Wight's medical needs by failing to provide any medical attention to Wight despite his obvious dehydration and opiate withdrawal indicated a serious medical condition.

229. As a direct and proximate result of Defendants' indifference, Wight suffered extensive blood clots in his brain and severe dehydration. These conditions ultimately caused Wight's death.

230. On information and belief, Wight was caused to endure prolonged pain and suffering leading up to the time of his death, even though his condition could have been diagnosed, treated, and stabilized. Accordingly, Plaintiffs seek compensation in an amount to be determined at trial for the pain and suffering. Wight endured prior to his death, and for the wrongful death of Wight.

231. Further, due to the egregious nature of Defendants' indifference and reckless distraught for the health, safety, and the very life of Wight, Plaintiff seeks punitive damages against said Defendants.

## CAUSE OF ACTION V – County Liability for Unnecessary Rigor
### Violation of Article I, Section 9 of the Utah Constitution
*Against Utah County*

232. Plaintiffs incorporate by reference all preceding paragraphs.

233. Utah County is considered "persons" under 42 U.S.C. §1983 and thus may be liable for causing a constitutional deprivation.

234. County may be held liable for constitutional wrongs caused by its failure to adequately train or supervise subordinates due to deliberate indifference.

235. County may be held liable for constitutional wrongs caused by deficient policies or practices.

236. On information and belief, Utah County regularly delays or denies access to mental health treatment and medications, causing inmates to suffer needlessly.

237.  Utah County has a policy or practice whereby it regularly denies patients access to mental health medications which have been prescribed by a physician.

238. Utah County makes these decisions to discontinue prescribed medications without input or review by a prescriber or mental health practitioner.

239. In some cases, Utah County staff will re-prescribe the medications if an inmate continues to struggle with their mental health over a prolonged period.

240. Utah County's practice, however, regularly results in the unnecessary delay in medication to inmates who need their psychotropic medication. This delay causes inmates to needlessly suffer from their mental health conditions.

241. Moreover, Utah County does not have protocols in place which tell nurses how to handle a mental health crisis.

242. Nor does Utah County provide training to nurses on how to handle mental health crises.

243. As a result, inmates suffering from mental health disorders needlessly languish in cells which are not outfitted to safely hold said patients.

244. The Utah County Jail does not have the medical resources to handle individuals suffering from serious mental health disorders, yet nursing staff regularly admit these individuals despite Jail policy not to admit these individuals.

245. If Utah County provided basic training or protocols on mental health, nursing staff would have known: (1) not to admit Wight due to his schizophrenia; (2) if admitted, to immediately refer a schizophrenic patient for a mental health evaluation; and (3) if an inmate is self-harming, to either implement precautions to make the inmate safe or to transport the inmate to a high level of care (such as an inpatient treatment facility).

246. Instead, due to the lack of training and policies, staff have learned to ignore inmates even when exhibiting severe and bizarre behaviors.

247. Defendants foresaw, or should have foreseen, the possibility of inmates receiving inadequate or delayed mental and physical health care for and dehydration while in the custody of Utah County Jail.

248. As a direct and proximate result of Defendant's actions, inactions, and/or deliberate indifference, Wight was deprived of his rights by Jail employees and agents in violation

of the 8th/ 14th Amendment to the United States Constitution and 42 U.S.C. §1983, i.e., he was deprived of his life without due process of law.

**CAUSE OF ACTION VI – Liability for Unnecessary Rigor**
**Violation of Article I, Section 9 of the Utah Constitution**
*Against WBH*

249. Plaintiffs incorporate by reference all preceding paragraphs.

250. WBH may be held liable for constitutional wrongs caused by its failure to adequately train or supervise subordinates due to deliberate indifference.

251. WBH may also be held liable for constitutional wrongs caused by deficient policies or practices.

252. WBH fails to train its social workers on how to handle mental health evaluations and treatment at the Utah County Jail.

253. Upon information and belief, WBH provides no specific training to its social workers regarding jail operations or policies regarding mental health and mental health evaluations.

254. The Jail is different from other outpatient environments because an inmate, or an inmate's family or other concerned persons, do not have the ability to have the inmate receive an independent evaluation. If WBH performs an inadequate evaluation,

255. WBH also has a practice/policy where if an inmate is too mentally impaired, social workers will simply discontinue the mental health evaluation.

256. WBH knows that Utah County Jail does not have mental health professionals and therefore relies on WBH to accurately evaluate inmates.

257. WBH's lack of training, coupled with its practice of discontinuing mental health evaluations in the face of severe mental illness, puts inmates at risk for serious harm.

258. WBH foresaw, or should have foreseen, the likelihood that inmates who receive inadequate mental health evaluations will not receive the care necessary at the Utah County Jail, leading to serious harm and/or death.

259. As a direct and proximate result of Defendant's actions and inactions, WBH, through its employees, subjected Wight to unnecessary rigor.

**CAUSE OF ACTION VII**
**Violation of the First Amendment, Freedom of Speech**
*Against Individuals DEPUTY ARCHULETTA, SGT. MCFARLAND, SGT. FARISH*

249. Plaintiff incorporates by reference all preceding paragraphs.

250.  Under the First Amendment, a citizen has the right to free expression.

251. Ms. Sayers was practicing her right to free speech by attempting to post on social media the circumstances of her son's hospitalization and the care her son received at the Utah County Jail.

252. Defendants Archuletta, McFarland, and Sgt. Farish knew that Ms. Sayers was attempting to post about her son on social media, including a video of his appearance.

253. Defendants did not want the public to know about Utah County Jail's treatment of Wight.

254. To prevent her posting on social media, Defendants Archuletta, McFarland, and Sgt. Farish came up with the plan to threaten her with expulsion from this hospital if she did not agree to delete the video and not post on TikTok.

255.  This type of threat (expulsion from the hospital while your son is in his final moments) would "chill a person of ordinary firmness from continuing to engage in the protected activity".

256. Sayers refused to agree to Defendants' terms, and they kicked her and her family out of the hospital.

257. Defendants Archuletta, McFarland, and Sgt. Farish violated Sayers' right to free speech, depriving her of precious time with her son prior to his death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests this court enter judgment against Defendants, and each of them and provide the following relief:

a.  Compensatory and special damages in whatever amount, exclusive of costs and interest, that Plaintiffs is found to be entitled;

b.  Punitive/exemplary damages against Defendants in whatever amount, exclusive of costs and interest, that Plaintiffs is found to be entitled;

c.  For interest and costs as allowed by law;

d.  For attorney fees, pursuant to 42 U.S.C. § 1988;

e.  For declaratory and injunctive relief barring Defendants from similar misconduct in the future; and

f.  Such other and further relief as the court deems appropriate.

Dated this October 24, 2025.

/s/ Tad D. Draper
/s/ Dan Baczynski
*Attorneys for the Plaintiffs*